**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br>Plaintiff | CIVIL NO.:  20-1744<br><br>Civil Action |
| **v.** | |
| **MUNICIPALITY OF SAN JUAN**<br>Defendant | |

## COMPLAINT

TO THE HONORABLE COURT:

The United States of America (hereinafter referred to as "the United States") on behalf of the Department of Health and Human Services, represented by the undersigned attorneys whom very respectfully states, alleges and prays as follows:

1. This action arises from the transfer of real property located in the Municipality of San Juan, Stop 7.5 Naval Reservation "Parcel C" (the "Property"), from the United States to the Municipality of San Juan ("Grantee"/"Municipality"). The United States transferred the Property to the Municipality subject to the Municipality making renovations and/or improvements to the Property and the Property being placed into use within thirty-six (36) months of the execution of the Quitclaim Deed (*See* Exhibit A). The Municipality breached these conditions, thereby entitling the United States to full possession of the Property. Accordingly, the United States brings this action seeking relief.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction pursuant to 28 U.S.C. § 1345 because the United States is the Plaintiff and 28 U.S.C. § 2201 because this action seeks a Declaratory Judgment.

3.      Venue lies in this district pursuant to 28 U.S.C. § 139l(b)(l) because the Defendant resides in this District, and pursuant to 28 U.S.C. § 139l(b)(2) because the Property at issue is located within this district.

## THE PARTIES

4.      Plaintiff is the United States of America.

5.      The Municipality of San Juan is a legal governmental entity.

## GENERAL ALLEGATIONS

6.      The General Services Administration ("GSA") is an agency of the United States that provides federal agencies with workplaces, goods, and services.

7.      The United States Department of Health and Human Services ("HHS" or "Grantor") is a federal agency with the mission of protecting the health of all Americans and providing essential human services.

8.      Prior to April 26, 2005, the United States owned the Property identified as Parcel "C" is located in the former Reserve Officers Beach Club, San Juan, Puerto Rico, located at Stop 7.5 Naval Reservation, San Juan, Puerto Rico. Parcel "C" consists of 4.940 acres of land.

9.      On or about April 26, 2005, the United States of America, through HHS, transferred the Property to the Municipality, by Quitclaim Deed ("Deed").

10.     The Deed was presented at the Property Registry, San Juan Section I, Entry No. 3874 of the year 2005, Journal 1163, Diary 1071. A true and accurate copy of the Deed is attached as Exhibit A.

11.     The property is more particularly described in the Deed as:

Parcel C

All that tract or parcel of land, in Reserve Officers Beach Club, San Juan, Puerto Rico, consisting of 2.237 acres, within the following metes and bounds description:

As a point of beginning, commence at point 18, run thence north 87- 14' -26" west, a distance of 234.980 feet, to point 17; run thence north 87-26' – 12" west, a distance of 119.116 feet, to point 16; run thence north 87- 46' -26" west, a distance of 53.447 feet, to point 15; run thence north 87- 11' – 16" west, a distance of 53.727 feet, to point 14; run thence south 86 -55' – 13" west, a distance of 17.383 feet, to point 13; run thence south 74- 57'- 32" west, a distance of 16.171 feet, to point 12; *run* thence south 67 – 29' — 10" west, a distance of 16.696 feet, to point 11; run thence south 61 — 49' — 26" west, a distance of 17.087 feet, to point 10; run thence north 04 — 31' — 56" east, a distance of 90.384 feet, to point 19; run thence north 83 — 18' —22" east, a distance of 184.749 feet, to point 20; run thence north 73 — 44' —48" east, a distance of 35.130 feet, to point 21; run thence north 63 —38' —00" east, a distance of 27.234 feet, to point 22; run thence north 22— 36' — 14" east, a distance of 13.965 feet, to point 23; run thence north 51 — 29' — 14" east, a distance of 33.589 feet, to point 24; run thence north 64— 49' — 32" east, a distance of 17.378 feet, to point 25; run thence north 67- 25' —42" east, a distance of 19.882 feet, to point 26, run thence north 79— 19' —31" east, a distance 130.688 feet, to point 27; run thence north 85 —04' — 15" east, a distance of 44.295 feet, to point 28; run thence south 72 — 47' — 25" east, a distance of 39.826 feet, to point 29; run thence north 88 — 55' — 46" east, a distance of 44.211 feet, to point 30; run thence north 88— 03' — 73" east, a distance of 38.756 feet, to point 31; run thence south 84 — 46' — 57" east, a distance of 79.891 feet, to point 32; run thence south 24 —44' — 00" west, a distance of 218.528 feet, to point 18, which is the point of beginning of the above described tract or parcel of land.

*See* Exhibit A at pp. 2-3.

12.     HHS transferred the Property to the Municipality through the Federal Property and Administrative Services Act of 1949, 40 U.S.C. § 550, and regulations promulgated pursuant thereto at 45 C.F.R. Part 12, which, among other provisions, allows the transfer of property owned by the United States for the protection of public health, and the McKinney-Vento Homeless Assistance Act, 42 U.S.C. § 11411, and regulations promulgated pursuant thereto at 45 C.F.R. Part 12a, which, among other provisions, allows the use of public buildings and real property to assist the homeless.

13.     The Deed provides that the Property was subject to conditions subsequent, more specifically, the following conditions subsequent:

1.     That for a period of thirty (30) years from the date hereof the Property herein conveyed will be used continuously for health purposes in accordance with Grantee's approved program of utilization as set forth in its application dated the 27th day of December 2002, amended on January 10, 2003, and for no other purpose;

2.     That during the aforesaid period of thirty (30) years Grantee will not resell, lease, mortgage, or encumber or otherwise dispose of any part of the Property or interest therein except as Grantor or its successor in function may authorize in writing;

3.     Where construction or major renovation is not required or proposed, the Property must be placed into use within twelve (12) months from the date of this Deed. Where construction or major renovation is contemplated at the time of transfer, the Property must be placed into use within thirty-six (36) months from the date of this Deed.

4.     That one year from the date hereof and annually thereafter for the aforesaid period of thirty (30) years, unless Grantor or its successor in function directs otherwise, Grantee will file with Grantor or its successor in function reports on the operation and maintenance of the Property and will furnish, as requested, such other pertinent data evidencing continuous use of the Property for the purposes specified in the above-identified application.

5.      That during the aforesaid period of thirty (30) years Grantee will
at all times be and remain a tax-supported organization or a
nonprofit institution, organization, or association exempt from
taxation under section 501(c)(3) of the Internal Revenue Code of
1986, as amended.

6.      That, for the period during which the Property is used for the
purpose for which the Federal assistance is hereby extended by
Grantor or for another purpose involving the provision of similar
services or benefits, Grantee hereby agrees that it will comply
with the requirements of section 606 of the Act (40 U.S.C. § 476);
the Fair Housing Act (42 U.S.C. § 3601-19) and implementing
regulations; and, as applicable, Executive Order 11063 (Equal
Opportunity in Housing) and implementing regulations; Title VI
of the Civil Rights Act of 1964 (42 U.S.C. § 2000d to d-4)
(Nondiscrimination in Federally Assisted Programs) and
implementing regulations; Title IX of the Education
Amendments of 1972 (20 U.S.C. § 1681) and implementing
regulations; the prohibitions against discrimination on the basis
of age under the Age Discrimination Act of 1975 (42 U.S.C. §
6101-07) and implementing regulations; the prohibitions against
otherwise qualified individuals with handicaps under Section
504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794) and
implementing regulations, and all requirements imposed by or
pursuant to the regulations of Grantor (45 C.F.R. Parts 12, 80,
84, 86 and 91) issued pursuant to said Acts and now in effect, to
the end that, in accordance with said Acts and regulations, no
person in the United States shall, on the ground of race, color,
national origin, sex, age, or handicap, be excluded from
participation in, be denied the benefits of, or otherwise be
subjected to discrimination under the program and plan referred
to in condition numbered 1 above or under any other program
or activity of Grantee, its successors or assigns, to which said
Acts and regulations apply by reason of this conveyance.

*See,* Exhibit A, pp. 4-5.

14.     The "approved program of utilization as set forth in its application dated the

27th day of December 2002, amended on January 10th, 2003," provided that the property was

transferred to the Municipality for homeless assistance and subsequently approved for the

public health use of providing health-related services to Children with Special Health Care

Needs for a period of 30 years. Under the terms of the Deed, the Municipality is subject to all of the conditions, covenants, and other requirements contained in the Deed.

15.     Despite HHS's good faith efforts, the Municipality failed to comply with the terms and conditions of use contained in the Deed with respect to the Property. In sum, the Municipality has failed to use the Property for any eligible/approved homeless assistance or public health purpose.

16.     A careful review of HHS's records as to "Parcel C" shows the Municipality: a) Failed to implement the approved program of use with respect to "Parcel C" in accordance with the Deed; b) Failed to maintain "Parcel C" in accordance with the terms of the Deed; c) Failed to demonstrate that the Commonwealth's Permit Management Office has approved Grantee's Location and Use Query, allowing for the development and operation of "Parcel C" for the proposed program of use; d) Failed to show that the Grantee has the financial ability to fund the development and operation of the proposed program of use; e) Repeatedly failed to provide information related to the proposed program of use upon request; and, f) Repeatedly attempted to circumvent the approval process related to the proposed program of use.

17.     The Municipality violated Condition 1 of the Deed for failing to continuously use the property for any eligible/approved homeless assistance or public health purpose as set forth in its application dated the 27th day of December 2002, amended on January 10th, 2003.

18.     The Municipality has failed to meet the requirement of placing the Property into use within thirty-six (36) months of the date of the Deed. The failure to meet this requirement has also placed the Grantee in noncompliance with condition subsequent number 1, which requires that the property be used continuously for public health purposes

in accordance with the Grantee's approved program of utilization; and condition subsequent number 4 requiring the Grantee file with HHS pertinent data evidencing continuous use of the Property for the approved program of use.

19.     The Deed further states that:

> In the event of a breach of any of the conditions subsequent set forth above, whether caused by the legal or other inability of Grantee, its successors and assigns, to perform any of the obligations herein set forth, Grantor or its successor in function will, at its option, have an immediate right of reentry thereon, and to cause all right, title, and interest in and to the Property to revert to the United States of America, and Grantee, its successors and assigns, shall forfeit all right, title, and interest in and to the Property and to any and all of the tenements, hereditaments, and appurtenances thereunto belonging;

*See* Exhibit A, p. 5.

20.     The Deed further states that:

> PROVIDED, HOWEVER, that the failure of Grantor or its successor in function to insist in any one or more instance upon complete performance of any of the said conditions subsequent shall not be construed as a waiver of or a relinquishment of the future performance of any of said conditions subsequent, but the obligations of Grantee with respect to such future performance shall continue in full force and effect;

*See* Exhibit A, p. 5.

21.     The Deed further states that:

> In the event title to the Property or any part thereof is reverted to the United States of America for noncompliance… [the Municipality]… shall be responsible for and shall be required to reimburse the United States of America for the decreased value thereof … [and]… United States of America shall, in addition thereto, be reimbursed for such damage, including such costs as may be incurred in recovering title to or possession of the above-described property, as it may sustain as a result of such noncompliance.

*See* Exhibit A, p. 7.

22.     On or about July 19, 2019, the United States of America, by a letter from

Theresa Ritta, Program Manager of Real Property Management Services Program Support Center of HHS, to Lizabel M. Negron-Vargas, Esq., legal counsel to the Municipality,  stated that it had elected to exercise its option to revert title of the above-referenced property (the "Property") to the United States based on Grantee's noncompliance with deed conditions subsequent numbers one (1), three (3), and four (4).  The decision to exercise the right of reverter provided in the Quitclaim Deed dated April 26, 2005, was a final determination.

23.     The Municipality has stated that it will not voluntarily revert title of the Property nor has it provided the United States of America with possession of, or title to, the Property.

### COUNT I
**(Reverter Because of Breach of Condition Subsequent)**

24.     The United States realleges and incorporates by reference paragraphs 1 through 23 of this Complaint as though fully set forth herein.

25.     By reason of the conduct described herein, and pursuant to the terms and condition of the Deed and federal law, the United States has an automatic right of reentry to the Property and Defendant has forfeited the Property to the United States of America.

26.     The conditions subsequent were created in the Deed for the benevolent, charitable, educational, and public purpose of ensuring that the Property would be developed promptly and restored to productive use by providing services to the homeless.

27.     The conditions subsequent were therefore created for benevolent, charitable, educational, or public purposes and restricts the use of land to carrying out such purpose.

28.     The United States has a substantial interest in enforcing the conditions subsequent contained in the Deed.

29.     The Municipality has breached the condition subsequent contained in the

Deed.

30.     The United States provided the Municipality with a written demand that possession of the Property be delivered to the United States, for violations of conditions subsequent contained in the Deed.

31.     Pursuant to the Deed, upon the breach of a condition subsequent, the United States has an immediate right of reentry and to take possession to the Property, and to cause all right, title, and interest in and to the Property to revert to the United States, and the Municipality, shall forfeit all right, title, and interest in and to the Property and to any and all of the tenements, hereditaments, and appurtenances thereunto belonging.

32.     The United States has the right to re-enter and take possession of the Property and to terminate the Municipality's interest in the Property.

33.     Title to the Premises revested in the United States by operation of law upon the Municipality's breach of the Deed conditions.

## COUNT II
### (Ejectment Because of Breach of Condition Subsequent)

34.     The United States realleges and incorporates by reference paragraphs 1 through 33 of this Complaint as though fully set forth herein.

35.     The Municipality breached a condition subsequent contained in the Deed.

36.     As a result of the Municipality's breach of a condition subsequent contained in the Deed, the United States is entitled to exclusive possession of the Property, and an order and judgment ejecting the Municipality from the Property and the Municipality shall not retain any rights or interests in the Property.

**COUNT III**
**(Costs Because of Breach of Condition Subsequent)**

37.     The United States of America realleges and incorporates by reference paragraphs 1 through 36 of this Complaint as though fully set forth herein.

38.     The Municipality breached a condition subsequent contained in the Deed.

39.     The Property may have decreased in value since being transferred to the Municipality.

40.     The United States is entitled to "non-use" payments due to the Municipality's non-use of the property for an approved purpose.

41.     The United States has and will incur costs, fees, and damages in connection with exercising its rights under the Deed.

42.     As a result of the Municipality's breach of a condition subsequent contained in the Deed, the United States is entitled to its fees, costs, and damages in an amount to be established.

**PRAYER FOR RELIEF**

WHEREFORE, the United States of America respectfully requests from this Honorable Court:

a)      An Order and Judgment declaring that the United States of America is vested with exclusive and absolute title to the Property, in fee simple free and clear of any liens, mortgages, or encumbrances;

b)      An Order and Judgment that the Property Registry, San Juan Section I be directed to take such action to reflect that the United States of America is vested with absolute and unencumbered title, in fee simple to the Property;

c)      An Order and Judgment compelling the Municipality to convey the Property

to the United States of America and to execute and deliver an unencumbered deed to the

Property to the United States of America;

d)      An Order and Judgment awarding the United States of America exclusive

possession of the Property;

e)      An Order and Judgment ejecting the Municipality, and any other entity or

person not authorized by HHS and/or the United States, from possession of the Property;

f)      An Order and Judgment awarding the costs and disbursements of this action;

g)      Such other and further relief as the Court shall deem proper and just.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico, this 23rd day of December, 2020.

W. STEPHEN MULDROW,
United States Attorney

*s/David O. Martorani-Dale*
David O. Martorani-Dale
Assistant U.S. Attorney
U.S.D.C.-P.R. 226004
Torre Chardon, Suite 1201
350 Carlos Chardon Street
San Juan, Puerto Rico
00918 Tel.  (787) 766-5656
Fax  (787) 766-6219
Email: david.o.martorani@usdoj.gov

Contract No.  01-PR-2257

## QUITCLAIM DEED

THIS INDENTURE, made this 26th day of April , 2005, between the United States of America, acting through the Secretary of Health and Human Services, by the Chief, Space Management Branch, Division of Property Management,  Program Support Center, U.S. Department of Health and Human Services (hereinafter referred to as "Grantor"), under and pursuant to the power and authority delegated by the Federal Property and Administrative Services Act of 1949 (40 U.S.C. § 550(d)), as amended (hereinafter referred to as "the Act"), and regulations promulgated pursuant thereto at 45 C.F.R. Part 12, and the McKinney-Vento Homeless Assistance Act (42 U.S.C. § 11411),  as amended, and the Municipality of San Juan (hereinafter referred to as "Grantee").

## <u>WITNESSETH</u>

WHEREAS, by letter dated February 20, 2004, from the General Services Administration, certain surplus property consisting of 7.35 acres more or less, hereinafter described (hereinafter referred to as "the Property"), was assigned to the Department of Health and Human Services for disposal upon the recommendation of the Grantor that the Property is needed for public health purposes in accordance with the provisions of the Act; and

WHEREAS, said Grantee has made a firm offer to purchase the Property under the provisions of the Act, has made application for a public benefit allowance, and proposes to use the Property in accordance with the approved program of utilization; and

WHEREAS, Grantor has accepted the offer of Grantee,

NOW, THEREFORE, Grantor, for and in consideration of the foregoing and of the observance and performance by  Grantee of the covenants, considerations and restrictions hereinafter contained and other good and valuable consideration, the receipt of which is hereby acknowledged, has remised, released and quitclaimed and by these presents does remise, release and quitclaim to Grantee, its successors and assigns, all right, title, interest, claim and demand, excepting and reserving such rights as may arise from the operation of the conditions subsequent hereinafter expressed, which the United States of America has in and to the Property, situate, lying, and being in the District of Puerta de Tierra, Municipality of San Juan, Commonwealth of Puerto Rico, and more particularly described as follows:

Parcel A

All that tract or parcel of land, in Stop 7.5, San Juan, Puerto Rico, consisting of 4.940 acres, within the following metes and bounds description:

As a point of beginning, commence at point 1, run thence north 70 – 36' – 53" east, a distance of 48.039 feet, to point 2; run thence north 77 – 18' – 21" east, a distance of 59.378 feet, to point 3; run thence north 81 – 27' – 32" east, a distance of 39.238 feet, to point 4; run thence north 82 – 11' – 20" east, a distance of 29.060 feet, to point 5; run thence north 84 – 34' – 07" east, a distance of 36.310 feet, to point 6; run thence south 87 – 05' – 08" east, a distance of 378.501 feet, to point 7; run thence north 21 – 15' – 04" west, a distance of 482.189 feet, to point 8; run thence north 78 – 23' – 28" west, a distance of 445.845 feet, to point 9; run thence north 04 – 30' – 02" east, a distance of 337.764 feet, to point 1, which is the point of beginning of the above described tract or parcel of land.

### Parcel B

All that tract or parcel of land, in Munoz Rivera Avenue, San Juan, Puerto Rico, consisting of 0.780 acres, within the following metes and bounds description:

As a point of beginning, commence at point 7, run thence north 87 – 05' – 08" west, a distance of 378.501 feet, to point 6; run thence south 84 – 34' – 07" west, a distance of 36.310 feet, to point 5; run thence south 82 – 11' – 20" west, a distance of 29.060 feet, to point 4; run thence south 81 – 27' – 32" west, a distance of 39.238 feet, to point 3; run thence south 77 – 18' – 21" west, a distance of 59.378 feet, to point 2; run thence south 70 – 36' – 53" west, a distance of 48.039 feet, to point 1; run thence north 05 – 17' – 32" east, a distance of 79.989 feet, to point 10; run thence north 61 – 49' – 26" east, a distance of 17.087 feet, to point 11; run thence north 67 – 29' – 10" east, a distance of 16.696 feet, to point 12; run thence north 74 – 57' – 32" east, a distance of 16.171 feet, to point 13; run thence north 86 – 55' – 13" east, a distance of 17.383 feet, to point 14; run thence south 87 – 11' – 16" east, a distance of 53.727 feet, to point 15; run thence south 87 – 46' – 26" east, a distance of 53.447 feet, to point 16; run thence north 87 – 29' – 12" east, a distance of 119.116 feet, to point 17; run thence south 87 – 14' – 26" east, a distance of 234.980 feet, to point 18; run thence south 19 – 43' – 58" west, a distance of 54.931 feet, to point 7, which is the point of beginning of the above described tract or parcel of land.

### Parcel C

All that tract or parcel of land, in Reserve Officers Beach Club, San Juan, Puerto Rico, consisting of 2.237 acres, within the following metes and bounds description:

As a point of beginning, commence at point 18, run thence north 87 – 14' – 26" west, a distance of 234.980 feet, to point 17; run thence north 87 – 26' – 12" west, a distance of 119.116 feet, to point 16; run thence north 87 – 46' – 26" west, a distance of 53.447 feet, to point 15; run thence north 87 – 11' – 16" west, a distance of 53.727 feet, to point 14; run thence south 86 – 55' – 13" west, a distance of 17.383 feet, to point 13; run thence south 74 – 57' – 32" west, a distance of 16.171 feet, to point 12; run thence south 67 –

29' – 10" west, a distance of 16.696 feet, to point 11; run thence south 61 – 49' – 26" west, a distance of 17.087 feet, to point 10; run thence north 04 – 31' – 56" east, a distance of 90.384 feet, to point 19; run thence north 83 – 18' – 22" east, a distance of 184.749 feet, to point 20; run thence north 73 – 44' – 48" east, a distance of 35.130 feet, to point 21; run thence north 63 – 38' – 00" east, a distance of 27.234 feet, to point 22; run thence north 22 – 36' – 14" east, a distance of 13.965 feet, to point 23; run thence north 51 – 29' – 14" east, a distance of 33.589 feet, to point 24; run thence north 64 – 49' – 32" east, a distance of 17.378 feet, to point 25; run thence north 67- 25' – 42" east, a distance of 19.882 feet, to point 26, run thence north 79 – 19' – 31" east, a distance 130.688 feet, to point 27; run thence north 85 – 04' – 15" east, a distance of 44.295 feet, to point 28; run thence south 72 – 47' – 25" east, a distance of 39.826 feet, to point 29; run thence north 88 – 55' – 46" east, a distance of 44.211 feet, to point 30; run thence north 88 – 03' – 73" east, a distance of 38.756 feet, to point 31; run thence south 84 – 46' – 57" east, a distance of 79.891 feet, to point 32; run thence south 24 – 44' – 00" west, a distance of 218.528 feet, to point 18, which is the point of beginning of the above described tract or parcel of land.

## Parcel D

All that tract or parcel of land, in Munoz Rivera Avenue, San Juan, Puerto Rico, consisting of 0.111 acres, within the following metes and bounds description:

As a point of beginning, commence at point 33, run thence north 85 – 00' – 43" west, a distance of 473.922 feet, to point 15; run thence south 87 – 46' – 26" east, a distance of 53.447 feet, to point 16; run thence south 87 – 26' – 12" east, a distance of 119.116 feet, to point 17; run thence south 87 – 14' – 26" east, a distance of 234.980 feet, to point 18; run thence south 19 – 43' – 58" west, a distance of 20.472 feet, to point 33, which is the point of beginning of the above described tract or parcel of land.

## Parcel E

All that tract or parcel of land, in Munoz Rivera Avenue, San Juan, Puerto Rico, consisting of 0.066 acres, within the following metes and bounds description:

As a point of beginning, commence at point 1, run thence north 46 – 32' – 02" east, a distance of 54.28 feet, to point 34; run thence arc, a distance of 34.59 feet, to point 35; run thence south 87 – 04' – 54" east, a distance of 136.226 feet, to point 6; run thence south 84 – 34' – 07" west, a distance of 36.310 feet, to point 5; run thence south 82 – 11' – 20" west, a distance of 29.060 feet, to point 4; run thence south 81 – 27' – 32" west, a distance of 39.238 feet, a point 3; run thence south 77 – 18' – 21" west, a distance of 59.378 feet, to point 2; run thence south 70 – 36' – 53" west, a distance of 48.038 feet, to point 1, which is the point of beginning of the above described tract or parcel of land.

Page 3 of  14

SUBJECT to any and all other existing easements, encumbrances, covenants, restrictions, reservations or conditions affecting the above described property whether or not the same appear on record.

The Grantee shall comply with all applicable Federal, State, municipal, and local laws, rules, orders, ordinances, and regulations in the occupation, use, and operation of the Property.

TO HAVE AND TO HOLD the Property subject, however, to each of the following conditions subsequent, which shall be binding upon and enforceable against Grantee, its successors and assigns, as follows:

1. That for a period of thirty (30) years from the date hereof the Property herein conveyed will be used continuously for health purposes in accordance with Grantee's approved program of utilization as set forth in its application dated the 27th day of December 2002, amended on January 10, 2003, and for no other purpose;

2. That during the aforesaid period of thirty (30) years Grantee will not resell, lease, mortgage, or encumber or otherwise dispose of any part of the Property or interest therein except as Grantor or its successor in function may authorize in writing;

3. Where construction or major renovation is not required or proposed, the Property must be placed into use within twelve (12) months from the date of this Deed. Where construction or major renovation is contemplated at the time of transfer, the Property must be placed into use within thirty-six (36) months from the date of this Deed.

4. That one year from the date hereof and annually thereafter for the aforesaid period of thirty (30) years, unless Grantor or its successor in function directs otherwise, Grantee will file with Grantor or its successor in function reports on the operation and maintenance of the Property and will furnish, as requested, such other pertinent data evidencing continuous use of the Property for the purposes specified in the above-identified application.

5. That during the aforesaid period of thirty (30) years Grantee will at all times be and remain a tax-supported organization or a nonprofit institution, organization, or association exempt from taxation under section 501(c)(3) of the Internal Revenue Code of 1986, as amended.

6. That, for the period during which the Property is used for the purpose for which the Federal assistance is hereby extended by Grantor or for another purpose involving the provision of similar services or benefits, Grantee hereby agrees that

it will comply with the requirements of section 606 of the Act (40 U.S.C. § 476); the Fair Housing Act (42 U.S.C. § 3601-19) and implementing regulations; and, as applicable, Executive Order 11063 (Equal Opportunity in Housing) and implementing regulations; Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d to d-4) (Nondiscrimination in Federally Assisted Programs) and implementing regulations; Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681) and implementing regulations; the prohibitions against discrimination on the basis of age under the Age Discrimination Act of 1975 (42 U.S.C. § 6101-07) and implementing regulations; the prohibitions against otherwise qualified individuals with handicaps under Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794) and implementing regulations, and all requirements imposed by or pursuant to the regulations of Grantor (45 C.F.R. Parts 12, 80, 84, 86 and 91) issued pursuant to said Acts and now in effect, to the end that, in accordance with said Acts and regulations, no person in the United States shall, on the ground of race, color, national origin, sex, age, or handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under the program and plan referred to in condition numbered 1 above or under any other program or activity of Grantee, its successors or assigns, to which said Acts and regulations apply by reason of this conveyance.

In the event of a breach of any of the conditions subsequent set forth above, whether caused by the legal or other inability of Grantee, its successors and assigns, to perform any of the obligations herein set forth, Grantor or its successor in function will, at its option, have an immediate right of reentry thereon, and to cause all right, title, and interest in and to the Property to revert to the United States of America, and Grantee, its successors and assigns, shall forfeit all right, title, and interest in and to the Property and to any and all of the tenements, hereditaments, and appurtenances thereunto belonging;

PROVIDED, HOWEVER, that the failure of Grantor or its successor in function to insist in any one or more instance upon complete performance of any of the said conditions subsequent shall not be construed as a waiver of or a relinquishment of the future performance of any of said conditions subsequent, but the obligations of Grantee with respect to such future performance shall continue in full force and effect;

PROVIDED FURTHER, that, in the event Grantor or its successor in function fails to exercise its option to reenter the premises and to revert title thereto for any such breach of conditions numbered 1, 2, 3, 4, or 5 herein within thirty-one (31) years from the date of this conveyance, conditions numbered 1, 2, 3, 4, and 5 herein, together with all rights to reenter and revert title for breach of condition, will, as of that date, terminate and be extinguished; and

Page 5 of 14

PROVIDED FURTHER, that the expiration of conditions numbered 1, 2, 3, 4, and 5 and the right to reenter and revert title for breach thereof, will not affect the obligation of Grantee, its successors and assigns, with respect to condition numbered 6 herein or the right reserved to Grantor, or its successor in function, to reenter and revert title for breach of condition numbered 6.

Grantee may secure abrogation of the conditions subsequent numbered 1, 2, 3, 4, and 5 herein by:

a.      Obtaining the consent of Grantor, or its successor in function, therefor; and

b.      Payment to the United States of America of 1/360th of the percentage public benefit allowance granted of the fair market value as of the date of such requested abrogation, exclusive of the value of improvements made by Grantee to the extent that they add to the value of that portion of the Property to be released, for each month of the period to be abrogated.

Grantee, by acceptance of this Deed, covenants and agrees for itself, its successors and assigns, with respect to the Property or any part thereof--which covenant shall attach to and run with the land for so long as the Property is used for a purpose for which Federal assistance is hereby extended by Grantor or for another purpose involving the provision of similar services or benefits, and which covenant shall in any event, and without regard to technical classification or designation, legal or otherwise, be binding to the fullest extent permitted by law and equity, for the benefit of and in favor of and enforceable by Grantor or its successor in function against Grantee, its successors and assigns for the Property, or any part thereof--that it will comply with the requirements of section 606 of the Act (40 U.S.C. § 476); the Fair Housing Act (42 U.S.C. § 3601-19) and implementing regulations; Executive Order 11063 (Equal Opportunity in Housing) and implementing regulations; Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d to d-4) (Nondiscrimination in Federally Assisted Programs) and implementing regulations; the prohibitions against discrimination on the basis of age under the Age Discrimination Act of 1975 (42 U.S.C. § 6101-07) and implementing regulations; and the prohibitions against otherwise qualified individuals with handicaps under Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794) and implementing regulations; and all requirements imposed by or pursuant to the regulations of Grantor (45 C.F.R. Parts 12, 80, 84, 86, and 91) issued pursuant to said acts and now in effect, to the end that, in accordance with said acts and regulations, no person in the United States shall, on the ground of race, color, national origin, sex, age, or handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under the program and plan referred to in condition numbered 1 above or under any other program or activity of Grantee, its successors or assigns, to which such acts and regulations apply by reason of this conveyance.

Grantee covenants and agrees that the Property will be used for secular purposes, with no more than a de minimis level of other activity.

Grantee, by acceptance of this deed, covenants and agrees for itself, its successors and assigns, that in the event Grantor exercises its option to revert all right, title, and interest in and to the Property to Grantor, or Grantee voluntarily returns title to the Property in lieu of a reverter, then Grantee shall provide protection to and maintenance of the Property at all times until such time as the title is actually reverted or returned to and accepted by Grantor. Such protection and maintenance shall, at a minimum, conform to the standards prescribed by the General Services Administration and codified in the Federal Property Management Regulations at 41 C.F.R. Subpart 101-47.4913 now in effect, a copy of which is attached to Grantee's aforementioned application.

In the event title to the Property or any part thereof is reverted to the United States of America for noncompliance or is voluntarily reconveyed in lieu of reverter, Grantee, its successors or assigns, at the option of Grantor, or its successor in function, shall be responsible for and shall be required to reimburse the United States of America for the decreased value thereof that is not the result of reasonable wear and tear, an act of God, or alterations and conversions made by Grantee, its successors or assigns, to adapt the property to the health use for which the property was transferred. The United States of America shall, in addition thereto, be reimbursed for such damage, including such costs as may be incurred in recovering title to or possession of the above-described property, as it may sustain as a result of such noncompliance.

Grantee, by acceptance of this deed, further covenants and agrees for itself, its successors and assigns, that in the event the Property or any part thereof is, at any time within the period of thirty (30) years from the date of this conveyance, sold, leased, disposed of, or used for purposes other than those designated in condition numbered 1 above without the consent of Grantor, or its successor in function, all revenues therefrom or the reasonable value, as determined by Grantor, or its successor in function, of benefits to Grantee, deriving directly or indirectly from such sale, lease, disposal, or use, shall be considered to have been received and held in trust by Grantee for the United States of America and shall be subject to the direction and control of Grantor, or its successor in function; but the provisions of this paragraph shall not impair or affect the rights reserved to Grantor under any other provision of this Deed.

Grantee, by acceptance of this deed, covenants and agrees for itself, its successors and assigns, that the Property is transferred on an "as is, where is," basis, without warranty of any kind, either expressed or implied, including as to the condition of the Property. Grantee also covenants and agrees for itself, its successors and assigns, that Grantor has no obligation to provide any additions, improvements, or alterations to the Property.

Grantor, in its capacity as a public benefit conveyance authority for the United States of America, does not assume liability, custody, or accountability for the property in the event title to the Property reverts to the United States of America for noncompliance with this Deed, or in connection with any hazardous substance activity or condition on the Property.

## NOTICE & COVENANT REGARDING HAZARDOUS SUBSTANCE ACTIVITY

Notice of Hazardous Substance Activity. Pursuant to Section 120(h)(3)(A)(i) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (CERCLA)(42 U.S.C. §9620(h)(3)(A)(i)), and based upon a complete search of agency files, the United States gives notice that **"Exhibit A"** provides the following information: (1) the type and quantity of hazardous substances that were known to have been released or disposed of or stored for one year or more on the Property; (2) the time such storage, release or disposal took place; and (3) a description of remedial action taken, if any.

CERCLA Covenant. The United States of America warrants that all remedial action necessary to protect human health and the environment has been taken before the date of this conveyance. The United States of America warrants that it shall take any additional response action found to be necessary after the date of this conveyance regarding hazardous substances located on the Property on the date of this conveyance.

(1)     This covenant shall not apply:  (a) in any case in which Grantee, its successors or assigns, or any successor in interest to the Property or part thereof is a Potentially Responsible Party (PRP) with respect to the Property immediately prior to the date of this conveyance; OR (b) to the extent that such additional response action or part thereof found to be necessary is the result of an act or failure to act of the Grantee, its successors or assigns, or any party in possession after the date of this conveyance that either:  (i) results in a release or threatened release of a hazardous substance that was not located on the Property on the date of this conveyance; or, (ii) causes or exacerbates the release or threatened release of a hazardous substance the existence and location of which was known and identified to the applicable regulatory authority as of the date of this conveyance.

(2)     In the event Grantee, its successors or assigns, seeks to have the United States of America conduct any additional response action, and, as a condition precedent to the United States of America incurring any additional cleanup obligation or related expenses, the Grantee, its successors or assigns, shall provide the United States of America at least 45 days written notice of such a claim.  In order for the 45-day period to commence, such notice must include credible evidence that:  (a) the associated contamination existed prior to the date of this conveyance; and (b) the need to conduct any additional response action or part thereof was not the result of any act or failure to act by the Grantee, its successors or assigns, or any party in possession.

Page 8 of  14

<u>Reservation of Right of Access</u>. The United States of America reserves a right of access to all portions of the Property for environmental investigation, remediation or other corrective action. This reservation includes the right of access to and use of available utilities at reasonable cost to the United States of America. These rights shall be exercisable in any case in which a remedial action, response action or corrective action is found to be necessary after the date of this conveyance, or in which access is necessary to carry out a remedial action, response action, or corrective action on adjoining property. Pursuant to this reservation, the United States of America, and its respective officers, agents, employees, contractors and subcontractors shall have the right (upon reasonable advance written notice to the record title owner) to enter upon the Property and conduct investigations and surveys, to include drilling, test-pitting, borings, data and records compilation and other activities related to environmental investigation, and to carry out remedial or removal actions as required or necessary, including but not limited to the installation and operation of monitoring wells, pumping wells, and treatment facilities. Any such entry, including such activities, responses or remedial actions, shall be coordinated with record title owner and shall be performed in a manner that minimizes interruption with activities of authorized occupants.

## NOTICE OF THE PRESENCE OF LEAD-BASED PAINT

Grantee hereby acknowledges the required disclosure in accordance with the Residential Lead-Based Paint Hazard Reduction Act of 1992, 42 U.S.C. 4852d (Title X), of the presence of any known lead-based paint and/or lead-based paint hazards in target housing constructed prior to 1978 on the Property. This disclosure includes the receipt of available records and reports pertaining to lead-based paint and lead-based paint hazards; receipt of the lead hazard information pamphlet; and inclusion of the 24 CFR 35 and 40 CFR 745 disclosure and lead warning language in its contract of sale. Grantee further acknowledges that Grantee was given the opportunity to inspect, and thereby assess, the Property for lead-based paint hazards.

Grantee covenants and agrees, that in any improvements on the Property defined as "target housing" by 24 CFR 35 and constructed prior to 1978, lead-based paint hazards will be disclosed to potential occupants in accordance with Title X before any use of such improvements as a residential dwelling.

Grantee further covenants that GRANTEE, with respect to target housing constructed prior to 1960, will abate, at Grantee's own cost, all lead hazards in accordance with 40 CFR 745.227(e) and other applicable laws and regulations, prior to the occupancy of any residential structures on the Property. Following the abatement, Grantee shall obtain a clearance examination, in accordance with 40 CFR 745.227(e) and 24 CFR 35.1340 (c) through (f), and conducted by a person certified to perform risk assessments or lead-based paint inspections. The examination must show that the clearance samples meet the standards set forth in 24 CFR 35.1320(b)(2).

Grantee must obtain a clearance report, prepared by a person certified to perform risk assessments or lead-based paint inspections and in accordance with 40 CFR 745.227(e)(10).  Prior to occupancy of the Property, Grantee shall provide Grantor with a fully executed CERTIFICATE OF COMPLETION OF LEAD ABATEMENT attached as **Exhibit B.**

Grantee covenants and agrees that in its use and occupancy of the Property it will comply with 24 CFR 35 and 40 CFR 745 and all applicable Federal, State and local laws relating to lead-based paint; and that Grantor assumes no liability for damages for property damage, personal injury illness, disability, or death, to Grantee, its successors or assigns, or to any other person, including members of the general public, arising from or incident to the purchase, transportation, removal, handling, use, disposition, or other activity causing or leading to contact of any kind whatsoever with lead-based paint on the Property described in this Deed, whether Grantee, and its successors or assigns, have properly warned or failed properly to warn the individual(s) injured.  Grantee further agrees to indemnify, defend and hold harmless the Grantor from any and all loss, judgment, claims, demands, expenses or damages, of whatever nature which might arise or be made against the United States of America, due to, or relating to the presence of lead-based paint hazard on the Property, any related abatement activities, or the disposal of any material from the abatement process.

Grantee covenants and agrees that it will comply with all Federal, state, local, and any other applicable law regarding the lead-based paint hazards with respect to the Property.

## ASBESTOS NOTICE

Asbestos-containing materials are believed to be present on the Property.  Since asbestos-containing materials are believed to be present on the Property, the Purchaser, its successors and assigns, shall be required to comply with all Federal, State, and local laws, relating to asbestos.

## NOTICE REGARDING NAVIGABLE AIRSPACE

This Deed is subject to the provisions that any construction upon or alteration of the property is prohibited unless a determination of no hazard to navigable airspace is issued by the Federal Aviation Administration in accordance with Title 14, Code of Federal Regulations, Part 77, entitled, "Objects Affecting Navigable Airspace", or under the authority of the Federal Aviation Act of 1958, as amended.

## HISTORIC PRESERVATION COVENANTS

The Property is listed (eligible for listing) in the National Register of Historic Places. Therefore, the Grantee, in accepting this Deed, acknowledges and accepts the following conditions and covenants:

1. Grantee shall maintain and preserve the Property in accordance with the recommended approaches in The Secretary of the Interior's Standards for Treatment of Historic Properties, 1995, Standards for Preservation (Technical Preservation Services for Historic Buildings, National Park Service) in order to preserve and enhance the distinctive materials, features and spaces that make the Property eligible for inclusion in the National Register of Historic Places.

2. When rehabilitation is the appropriate treatment, Grantee shall rehabilitate the Property in accordance with the recommended approaches in The Secretary of the Interior's Standards for Treatment of Historic Properties, 1995, Standards for Rehabilitation (Technical Preservation Services for Historic Buildings, National Park Service). Rehabilitation is appropriate when repair and placement of deteriorated features is necessary or when alteration or additions to the property are planned.

3. Distinctive materials, features, finishes, construction techniques and examples of craftsmanship that characterize the Property shall be preserved.

4. Plans of proposed rehabilitation, construction, alteration or replacement of distinctive materials, features, finishes or spaces which would affect the appearance or structural integrity of the Property shall be reviewed and approved by the State Historic Preservation Officer ("SHPO") for consistency with in The Secretary of the Interior's Standards for Treatment of Historic Properties, 1995.

5. Archaeological resources shall be protected and preserved in place. All projects involving ground-disturbing activity shall be reviewed by the SHPO. If such resources must be disturbed, mitigation measures must be undertaken with the express prior written permission of the SHPO.

6. The SHPO shall be permitted at all times to inspect the Property in order to ascertain if the above conditions are being observed.

7. In the event that the Property, or any associated historic artifact associated with the Property ceases to be maintained in compliance with the covenants, conditions and restrictions set forth in this section, in addition to any remedy now or hereafter provided by law, the SHPO may, following reasonable notice institute suit to enjoin said violation or to require restoration of the Property by the Grantee.

8. The covenants, conditions and restrictions contained herein shall be inserted by the Grantee verbatim, or by express reference in any deed or other legal instrument by which it divests itself of either the fee simple title or any other lesser estate in the Property.

9. The Grantee agrees that the SHPO may, at its discretion, without prior notice to the Grantee, convey and assign all or part of its rights and responsibilities contained herein to a third party.

10. The failure of the SHPO to exercise any right or remedy granted under this instrument shall not have the effect of waiving or limiting the exercise of any other right or remedy or the use of such right or remedy at any other time.

11. The covenants, conditions and restrictions set forth in this Historic Preservation Covenant shall constitute a binding servitude upon the Property and shall be deemed to run with the land.

IN WITNESS WHEREOF, Grantor has caused this instrument to be executed as of the day and year first above written.

UNITED STATES OF AMERICA
Acting through the Secretary of Health and Human Services

By:_____

John G. Hicks, Chief
Space Management Branch
Division of Property Management
Program Support Center

## ACKNOWLEDGMENT

STATE OF MARYLAND   )
COUNTY OF MONTGOMERY ) SS

On this 26th day of April 2005,  before me the undersigned officer, personally appeared John G. Hicks, known to me to be the Chief, Space Management Branch,  Division of Property Management, Department of Health and Human Services, and known to me to be the person who executed the foregoing instrument on behalf of the Secretary of Health and Human Services, for the United States of America, and acknowledged to me that he subscribed to the said instrument in the name of the Secretary of Health and Human Services and on behalf of the United States of America.

Witness my hand and official seal.

(SEAL)

_Jerry Ann Gaynes_
Notary Public

My commission expires: _3/1/2005_

JERRY ANN GAYNES
Notary Public, State of MD.
My Commission Expires
March 1, 2007

Page 13 of  14

## ACCEPTANCE

The Municipality of San Juan hereby accepts this deed and thereby agrees to all the terms, covenants, conditions and restrictions contained therein.

By _____

Jorge A. Santini, Mayor

## ACKNOWLEDGMENT

STATE OF PUERTO RICO      )
MUNICIPALITY OF SAN JUAN  ) SS

On this 28 day of April, 2005, before me, a Notary Public in and for the Municipality of San Juan, State of Puerto Rico, personally appeared, Jorge A. Santini, known to me to be the Mayor, and known to me to be the person who executed the foregoing instrument on behalf of the City of San Juan, and acknowledged to me that he executed the same as the free act and deed of City of San Juan.

Witness my hand and official seal.

(SEAL)

AFFIDAVIT NO.   2544

_____
Notary Public

My commission expires *IS FOR LIFE*

**Seal:** JUAN B. SOTO BALBAS — 1981 — ABOGADO NOTARIO

Page 14 of 14

**FINDING OF SUITABILITY TO TRANSFER
STOP 7 ½ NAVAL RESERVATION
SAN JUAN, PUERTO RICO**
11 February 2004

## I.   Purpose

The purpose of this Finding of Suitability to Transfer (FOST) is to provide a summary of all environmental activities at the Stop 7 ½ Naval Reservation and to document the determination that site is suitable to transfer to the City of San Juan, PR for the intended use as a homeless shelter without unacceptable risk to human health and the environment. In addition, the FOST provides notice that the U.S. Navy has completed all necessary soil clean-up actions under CERCLA, thus enabling the U.S. Department of Health and Human Services (HHS) to assign the property to the City of San Juan. The Stop 7 ½ property requires no further environmental cleanup actions under CERCLA and is eligible to receive all required CERCLA covenants.

## II.   Site Description and Background

The Stop 7 ½ Naval Reservation is a 7.35-acre administrative/recreational complex located in the Puerto de Tierra business district of Old San Juan, PR (Figure 1-1). The site is comprised of a 4.94-acre landside parcel and a 2.24-acre oceanside parcel separated by Munoz Rivera Avenue. A portion of Munoz Rivera Ave. and the adjacent sidewalk make up the remaining 0.17 acres. Office buildings, storage buildings and residential housing occupy the landside parcel while the oceanside parcel is leased out to two tenants including the Reserve Officers Beach Club and the Dumas Restaurant (Figure 1-2)

The Department of the Army acquired this land by Executive Order in June 1903, although it has been used by the Navy since 1904. The land was transferred to the Navy in 1930. The site formerly functioned as the U.S. Naval Radio Station (1930 to 1952) until the radio station operations were moved to Naval Security Group Activity, Sabana Seca, Puerto Rico. Although several organizations have leased the space and buildings since 1930, no industrial or manufacturing activities are known to have been conducted at the site. The last occupant of the landside parcel was the Federal Bureau of Prisons who used the site for administrative offices and employee housing up until the mid-1990s. The landside parcel has remained unoccupied since that time.

Excessing activities at the site began in the early 1990s but environmental issues had prevented transfer actions from proceeding. Numerous environmental investigations conducted by the U.S. Navy beginning in 1994 identified soils contaminated with polychlorinated biphenyls (PCBs), polynuclear aromatic hydrocarbons (PAHs), lead, and arsenic as well as asbestos and lead-based paint in office buildings and housing units.

In 2002, the City of San Juan submitted an application to HHS to use Stop 7 ½ for the purpose of housing homeless women and children under the McKinney Act. In order to expedite the transfer process, the U.S. Navy agreed to address all CERCLA-related contaminated soil issues and the City of San Juan agreed to address the non-CERCLA lead-based paint and asbestos issues. In April 2003, HHS agreed to assign Stop 7 ½ to San Juan contingent upon the Navy's completion of all CERCLA clean-up actions. The non-CERCLA cleanup to be completed by San Juan will be covenanted in the Public Benefit Conveyance.

III.    **Environmental Condition of the Property**

A.    **Initial Site Investigation Activities**

As indicated above, The U.S. Navy began investigation activities at the site in 1994 with a Phase I Environmental Baseline Survey (EBS). Although no sampling was conducted, the Phase I EBS identified several areas of potential environmental concern including an incinerator-type structure, a concrete pad possibly contaminated with PCBs, several possible Underground Storage Tanks (USTs), and three possible machine gun embankments. Due to these issues, a Phase II EBS was recommended.

A Phase II EBS including sampling was conducted in 1998. Sampling was conducted at each of the areas of concern identified during the Phase I EBS. The sampling found elevated levels of arsenic at the machine gun embankments, confirmed the presence of two USTs, and determined that the concrete pad contained PCBs. The Phase II recommended additional sampling to establish a background range for arsenic and to delineate the extents of the PCB contamination for purposes of removal. Additional investigation of the USTs at Buildings 445 and 449 was also recommended.

A Sample Strategy Plan (SSP) was prepared in March 2000 that proposed sampling and data collection methods to establish background metal concentrations, confirm and delineate the areas of suspected contamination, establish soil disposal options, and perform a lead and asbestos survey. As part of the SSP surface soil sampling and concrete chip sampling was conducted at the transformer pad and surface soil samples were collected in relation to the incinerator. Background surface soils samples were collected from within the Stop 7.5 property and the adjacent Muñoz Rivera Public Park. Surface soil samples were also collected from the area of the former machine gun stations.

The results for all the samples collected as part of the SSP were presented in Appendix A of the Draft Final Site Investigation (SI) Work Plan prepared in 2002. The sampling proposed for the lead and asbestos survey were performed in the Remediation Plan as discussed below.

A Remediation Plan was prepared in April 2000 to further delineate the areas of concern referenced in the EBS Phase II recommendations. It was also determined that a lead-based paint and asbestos survey was necessary. Samples were collected from the residential structures for lead-based paint and asbestos containing material. Additionally, soil samples were collected from around the building footprints and the playground area. The soil samples revealed elevated levels of lead at several locations throughout the property.

A Risk Assessment was then performed to determine the remediation alternative for the asbestos and lead based paint. In order to establish a cleanup goal for the Remediation Plan, additional soil samples were taken from several locations throughout the property and off-site to establish a background level for lead. The samples collected from on-site showed elevated levels of lead, whereas the sample from off-site showed low-levels of lead. A Remediation Plan could not be written until additional soil sampling was conducted to delineate the lead contamination in the on-site soils.

In July 2000, two USTs located next to the garage at Building 449 and adjacent to Building 445 were removed. Confirmation samples were collected during the time of the UST removal, with samples collected at the base and sides of the excavation. After reviewing the UST Closure Reports for both tanks the Puerto Rico Environmental Quality Board (PREQB) determined that no further actions were required at the Bldg. 449 UST, but required the Navy to perform a Site Characterization for the UST at Bldg. 445. The impact of the leaking UST at Bldg. 445 was investigated and characterized in November 2000. Surface and subsurface soil sampling was conducted in the area of the UST excavation. The resulting information was summarized in a Site Characterization/Site Assessment Report. All detected soil

concentrations were below the PREQB target level for Total Petroleum Hydrocarbons (TPH)-Diesel Range Organics (DRO) and no further actions were required.

### B.  Detailed Site Investigation Activities

A detailed Site Investigation (SI) was completed in March 2003 to address data gaps identified in previous reports and to fully delineate areas of soil contamination requiring remediation. The SI at Stop 7 ½ consisted of the collection of surface soil samples from designated background locations as well as numerous surface and subsurface soil samples from the Transformer Pad area and 50 ft. by 50 ft. sample grids located inside the Stop 7 ½ compound.

The results of the SI indicated that there were four constituents of concern in the soil at Stop 7.5 including PAHs, aroclor-1260 (PCB), arsenic, and lead. However, several data gaps regarding the extent of soil contamination remained at the conclusion of SI activities and U.S. EPA Region 2 required the Navy to perform additional sampling activities and to prepare a human health risk assessment. This additional sampling and the results of the risk assessment were documented in an Addendum to the Site Investigation Report submitted in June 2003. The extent and distribution of all contaminants of concern as presented in the SI Addendum are presented in Figures 3-1 through 3-5.

### C.  Site Remediation Activities

The Risk Assessment concluded that exposure to environmental conditions at Stop 7 ½ exceeded USEPA's acceptable criteria. Therefore, preliminary remediation goals (PRGs) for surface and subsurface soil based on future residential use of the site were developed as follows:

| | |
|---|---|
| Benzo(a)pyrene | 0.087 mg/kg |
| Arochlor 1260 | 1 mg/kg |
| Lead | 400 mg/kg |

Although arsenic was identified as being above the EPA Region III residential RBC, it was determined that the approximate post-remediation risk to potential residential receptors would be within the acceptable range at $5.1 \times 10^{-5}$ after the removal of PCB, benzo(a)pyrene, and lead in soils. However, the Navy, EPA Region II and PREQB agreed that the excavation of soils from two areas that contained the highest concentrations of arsenic would be performed as a conservative measure.

A separately bound Engineering Evaluation/Cost Analysis (EE/CA) was developed concurrently with the SI Report to evaluate potential technologies and remedial alternatives for cleaning up the contaminated soils. An Action Memorandum was then prepared that sets forth the Navy's selected alternative. The alternative chosen included excavation and off-site disposal of contaminated soils.

Remedial design documents including a Basis of Design, a Remediation Work Plan, and Technical Specifications were prepared in the summer of 2003 and on site soil excavation activities commenced in August 2003. Remedial activities were completed in Sept. 2003 when confirmation samples indicated that all remediation goals were achieved. All excavated areas were backfilled with clean fill, covered with topsoil, revegetated, and the site restored to suitable conditions. Figure 2 is an as-built drawing indicating the areas where excavation activities actually occurred in the field.

An additional UST adjacent to Bldg. 443 was discovered during remedial activities. The tank was removed November 2003 and soil samples obtained from the tank excavation indicated non-detectable concentrations of TPH. A UST Closure Assessment Report (CAR) was prepared in December 2003 and

submitted to PREQB for approval.  Approval was granted via letter from PREQB dated 9 Feb 2004 (Attachment A).

IV.    **Environmental Protection Provisions**

As required by CERCLA as amended by CERFA (§9620 (h)(4)(D)), the deed of transfer for property to be transferred to the City of San Juan shall contain:

- a covenant warranting that the U.S. Navy has taken all remedial action necessary to protect human health and the environment at the Stop 7 ½ site and any response action or corrective action due to Navy activities found to be necessary after the date of transfer shall be conducted by the United States, and

- a clause granting the United States access to the property in any case in which a response action or corrective action is found to be necessary after such date at such property, or such access is necessary to carry out a response action or corrective action on adjoining property.

Asbestos containing materials are present on the property.  The Deed shall require the grantee, its successors and assigns, to comply with all federal, state, and local laws related to asbestos containment/abatement.

The buildings on the property contain lead-based paint.  The Deed shall include a provision requiring the grantee to be responsible for compliance with all applicable Federal, State, and local laws, ordinances, orders, and regulations relating to lead-based paint including taking steps for its abatement or removal. After completing any lead-based paint abatement activities, the Grantee shall complete and execute a Certificate of Completion of Lead Abatement.

V.    **Regulator Coordination**

The Navy has worked closely with The Puerto Rico Environmental Quality Board (PR EQB) and the US Environmental Protection Agency (US EPA) Region 2 throughout the investigation and remediation process to ensure that all regulatory concerns were addressed.  Review and concurrence with all remedial activities including the Site Investigation, EE/CA, Action Memorandum, Basis of Design, Remedial Action Work Plan, Close-Out Report, and UST Reports has been received.

VI.    **Finding Of Suitability to Transfer**

I, the undersigned, have determined that subject to the inclusion of the appropriate deed notices and covenants as described above, the property described in this Finding of Suitability for Transfer for the Stop 7 ½ property in San Juan, PR, and proposed for transfer to the City of San Juan, PR is suitable for the intended reuse and that to allow such uses would be protective of human health and the environment.

J.R. Bailey
Head, Environmental Programs Branch
Atlantic Division, Naval Facilities Engineering Command

02/11/04
Date

**ATTACHMENT A**
**PREQB APPROVAL LETTER OF 9 FEB 2004**



**COMMONWEALTH OF PUERTO RICO**
*OFFICE OF THE GOVERNOR*

February 9, 2004

Mr. Pedro Ruiz
U.S. Naval Station Roosevelt Roads
PSC 1008 Box 3021
FPO AA 34051-3021

SUBJECT:    CLOSURE REPORT
            NAVAL RESERVATION BLDG. 443
            STOP 7½
            SAN JUAN, P.R.
            PR# 02-00-0016

Dear Mr. Ruiz:

The Underground Storage Tanks Management Division (USTMD) of the Water Quality Section (WQS) of the Environmental Quality Board (EQB) received on January 16, 2004 the following document for the appropriate revision and evaluation: *Underground Storage Tank Closure Assessment Report*.  This document contains the analysis results of the soil sampling performed in the area where a 2,000-gallon diesel underground storage tank was located.   The consultant company Shaw Environmental, Inc. prepared the report.

After evaluating the information submitted, the following statements apply:

1.  Benzene, toluene, ethyl benzene and total xylene (BTEX) concentrations; as well as total petroleum hydrocarbons (TPH) concentrations in the soil sampling performed from the tank excavation were below the method detection limits or below the USTMD permitted limits.

2.  Tank notification was submitted in conjunction with this report.

Based on the data submitted in the document *Underground Storage Tank Closure Assessment Report* prepared by the company Shaw Environmental, Inc. the Water Quality Area relieves the U.S. Department of the Navy, from any additional environmental

study where the Underground Storage Tank (UST) was located, Facility # PR 02-00-0016.  However, records of this closure report must be maintained for a minimum of three years to comply with the federal requirements 40 CFR 280.24 (b) and (5); 40 CFR 280 Subpart G of September 27, 1988; and Part VII of the Puerto Rico Underground Storage Tank Control Regulation of November 7, 1990.

This facility was relieved from the List of Facilities Under Corrective Actions (LUST) on March 21, 2002.

To clarify any doubts or questions you can contact Mr. Manuel Ceide, Environmental Specialist from USTMD at telephone number (787) 787-8181 Ext. 2608.  Also, you can visit our offices located at 431 Ponce de Leon Ave., National Plaza Building, 5th Floor, Hato Rey, Puerto Rico.

Cordially,

Signed/

Ing. Rubén González, Director
Water Quality Area

2



**ESTADO LIBRE ASOCIADO DE PUERTO RICO**

*OFICINA DE LA GOBERNADORA*

*E4* ~~NSB~~ 2/10
*FYI/A*
*R.*
*2/10*

9 de febrero de 2004

Sr. Pedro Ruíz
U.S. Navy Station Roosevelt Roads
PSC 1008 Box 3021
FPO AA 34051-3021

RE:  **INFORME DE CIERRE**
**NAVAL RESERVATION BLDS. 443**
**PARADA 7 ½**
**SAN JUAN, P.R.**
**PR#02-00-0016**

Estimado señor Ruíz:

La División para el Manejo de Tanques de Almacenamiento Soterrados (DMTAS) del Area de Calidad de Agua (ACA) de la Junta de Calidad Ambiental (JCA) recibió el 16 de enero de 2004, para revisión y evaluación correspondiente el documento *Underground Storage Tank Closure Assessment Report* con los resultados del muestreo de terreno realizado en el área donde se encontraba un (1) tanque de almacenamiento soterrado (TAS) de 2,000 galones para el almacenaje de diesel en la facilidad en referencia.  El informe fue preparado por la compañía consultora Shaw Environmental, Inc.

Posterior a la evaluación del documento, se ha determinado lo siguiente:

1.  Las concentraciones de benceno, tolueno, etilbenceno y xilenos totales (BTEX, por sus siglas en inglés)así como las concentraciones de hidrocarburos totales de petróleo (TPH, por sus siglas en inglés) en las muestras de terreno de la fosa donde se encontraba el TAS que almacenaba diesel estuvieron por debajo de los límites de detección del método de análisis o de los límites permitidos por la DMTAS.

2.  La notificación de cierre fue sometida junto con el informe.

A base de los datos sometidos en el documento *Underground Storage Tank Closure Assessment Report* preparado por la compañía Shaw Environmental, Inc.  El Area de Calidad de Agua releva al Departamento de la Marina de Estados Unidos, de cualquier estudio ambiental adicional a realizarse en el área donde se encontraba el TAS en la facilidad 00-0016.  Sin embargo, el expediente de este cierre, deberá mantenerse por lo menos tres (3) años para cumplir con los requisitos federales (Secciones 280.24 (b) y (5) y Subparte G del Código de Reglamento Federales (CFR, por sus siglas en inglés)) promulgados el 27 de septiembre de 1988 y de la Parte VII del Reglamento para el Control de Tanques de Almacenamiento Soterrados promulgado por esta Junta el 7 de noviembre de 1990.

*Verdes Bosques y Aguas Claras, Aire Limpio y Nubes Blancas: ¡Cuidas la Vida si no la Contaminas!*
EDIFICIO NACIONAL PLAZA, 431 AVE. PONCE DE LEON, HATO REY, PUERTO RICO 00917
APARTADO 11488 SANTURCE, PUERTO RICO 00910  TELEFONO: 767-8181

Feb.10. 2004  2:50PM  AREA DE CALIDAD DE AGUA  No.1254  P. 2

**CONT. INFORME DE CIERRE**
**NAVAL RESERVATIONS BLDGS. 443**
**PR# 02-00-0016**
**PAGINA 2**

Esta facilidad fue relevada de la Lista de Facilidades en Acciones Correctivas (LUST List, por sus siglas en inglés) el 21 de marzo de 2002.

Para aclarar cualquier duda o pregunta se puede comunicar con la Sr. Manuel Ceide, Especialista Ambiental de la DMTAS al teléfono 767-8181 Ext. 2608. También, nos pueden visitar en nuestras oficinas localizadas en la Ave. Ponce de León # 431, Edificio Nacional Plaza, Quinto Piso, Hato Rey, Puerto Rico.

Cordialmente,

Ing. Rubén González, Director
**Area de Calidad de Agua**

**FIGURES**



SITE

1 inch = 2000 ft.

Baker

SOURCE: U.S.G.S. TOPOGRAPHIC QUADRANGLE.

FIGURE 1−1
SITE LOCATION MAP

STOP 7.5 NAVAL RESERVATION
SAN JUAN, PUERTO RICO





Baker

100 0 50 100
1 inch = 100 ft

LEGEND

- ☐ - DENOTES FORMER STRUCTURE
- ---- - PROPERTY BOUNDARY
- - - FORMER UST LOCATION

SOURCE: ICF KAISER.

FIGURE 1-2
SITE PLAN

STOP 7.5 NAVAL RESERVATION
SAN JUAN, PUERTO RICO



SITE PLAN

MUÑOZ RIVERA AVENUE

FORMER
TOOL HOUSES

RADIO STATION
POWER HOUSE

STOP 7.5 NAVAL RESERVATION
SAN JUAN, PUERTO RICO

BAKER ENVIRONMENTAL, Inc.
Coraopolis, Pennsylvania

PCB RESULTS IN TRANSFORMER PAD SOIL
SAMPLES

FIGURE
3-1



SURFACE SOIL EXCEEDS 400 ppm FOR LEAD

SURFACE SOIL RESULT < 400 ppm FOR LEAD

SURFACE SOIL RESULT EXCEEDS 400 ppm FOR LEAD

SURFACE SOIL RESULT EXCEEDS 400 ppm FOR LEAD

**LEGEND**

- ARCHEOLOGICAL SENSITIVE AREAS
- PROPERTY BOUNDARY
- EXCAVATION AREA BOUNDARY
- BACKGROUND SURFACE SOIL LOCATION (NOV. 2002)
- BACKGROUND SURFACE SOIL LOCATION (APRIL 2000)
- SOIL SAMPLE LOCATION (MARCH 2003)

SOURCE: ICF KAISER.

FIGURE 3-2

SURFACE SOIL LEAD RESULTS

STOP 7.5 NAVAL RESERVATION
SAN JUAN, PUERTO RICO



LEGEND

- ARCHEOLOGICAL SENSITIVE AREAS
- PROPERTY BOUNDARY
- EXCAVATION AREA BOUNDARY
- BACKGROUND SURFACE SOIL LOCATION (NOV. 2002)
- BACKGROUND SURFACE SOIL LOCATION (APRIL 2000)
- SOIL SAMPLE LOCATION (MARCH 2003)

SOURCE: ICF KAISER.

Baker

FIGURE 3-3

SUBSURFACE SOIL LEAD RESULTS

STOP 7.5 NAVAL RESERVATION
SAN JUAN, PUERTO RICO

- SUBSURFACE SOIL EXCEEDS 400 ppm FOR LEAD
- 8 SUBSURFACE SOIL RESULT < 400 ppm FOR LEAD
- 0.5 – 2.0' SUBSURFACE SOIL RESULT EXCEEDS 400 PPM LEAD



LEGEND

- ARCHEOLOGICAL SENSITIVE AREAS
- PROPERTY BOUNDARY
- EXCAVATION AREA BOUNDARY
- BACKGROUND SURFACE SOIL LOCATION (NOV. 2002)
- BACKGROUND SURFACE SOIL LOCATION (APRIL 2000)
- SOIL SAMPLE LOCATION (MARCH 2003)

SOURCE: ICF KAISER.

FIGURE 3-4

SURFACE SOIL ARSENIC RESULTS

STOP 7.5 NAVAL RESERVATION
SAN JUAN, PUERTO RICO

* SURFACE SOIL EXCEEDS 7.75 ppm FOR BACKGROUND ARSENIC





SUBSURFACE SOIL EXCEEDS 7.75 ppm FOR BACKGROUND ARSENIC

1 inch = 100 ft

**LEGEND**

- ARCHEOLOGICAL SENSITIVE AREAS
- PROPERTY BOUNDARY
- EXCAVATION AREA BOUNDARY
- BACKGROUND SURFACE SOIL LOCATION (NOV. 2002)
- BACKGROUND SURFACE SOIL LOCATION (APRIL 2000)
- SOIL SAMPLE LOCATION (MARCH 2003)

SOURCE: ICF KAISER.

**Baker**

FIGURE 3-5

SUBSURFACE SOIL ARSENIC RESULTS

STOP 7.5 NAVAL RESERVATION
SAN JUAN, PUERTO RICO



OFFICE
DRAWING NUMBER 844344-D4
LUGO VINAS STREET
PONCE DE LEON AVE.
SAN AGUSTIN STREET
MUÑOZ RIVERA AVE.
LEGEND:
0.5 FT. EXCAVATION DEPTH
2.0 FT. EXCAVATION DEPTH
3.0 FT. EXCAVATION DEPTH
TREE NOT REMOVED DURING EXCAVATION
UST
SIDEWALK
SCALE
FIGURE 2
ATLANTIC DIVISION
Shaw Environmental, Inc.
SITE AS-BUILT CONDITIONS
REVISIONS

Exhibit B

## CERTIFICATE OF COMPLETION OF LEAD HAZARD ABATEMENT

The property consists of 7.35 acres of land, with improvements located at Stop 7.5 Naval Reservation, San Juan, Puerto Rico (the "Property").

Name and Address of Grantee:   Municipality of San Juan
                              PO Box 9024100, San Juan, PR   00902-4100

Mark appropriate boxes with an "X".

_____ Grantee certifies that lead hazards were abated and that the following statements are true:

1. All lead-based paint hazards were abated from the Property in accordance with 40 CFR 745.227(e) and other applicable laws and regulations prior to the occupancy of any residential improvements.

2. No more than 12 months elapsed from the date on the Government's risk assessment to the time when onsite preparation activities for the abatement commenced, or the risk assessment was made current by the Grantee prior to the commencement of such activities, at no cost to the Government.

3. A clearance examination was performed in accordance with 40 CFR 745.227(e) and 24 CFR 35.1340 (c) through (f), by a person certified to perform risk assessments or lead-based paint inspections. The examination reveals that clearance samples meet the standards set forth in 24 CFR 35.1320(b)(2).

4. A true and correct copy of the clearance report, prepared by a person certified to perform risk assessments or lead-based paint inspections and in accordance with 40 CFR 745.227(e)(10), is attached.

_____ Grantee hereby certifies that the Property will not be occupied as a residence or serve children under six years of age or pregnant women (as lead-based paint poses a particular risk to this group).

_____ Grantee hereby certifies that pre-1960 housing will not be used as a residence and will be demolished, in accordance with local laws and regulations.

*Under penalty of perjury, the Grantee hereby declares that the foregoing statements are true and correct to the best of his or her knowledge and belief.*

By: _____

Print Name & Title: _____

Date: _____

# REGISTRO DE LA PROPIEDAD SECCION SAN JUAN I

**HON. LORRAINE RIEFKOHL GORBEA**
**C/ PEÑUELAS #67, SAN JUAN**                                      **Telefono (787) 751-7071**

| | | |
|---|---|---|
| **ENTRADA Nº:** | **3874** | **Del año 2005** |
| **ASIENTO Nº :** | **1163    Diario 1071** | |
| **Presentado el día 26/05/2005** | | **a las 14:59** |

Presentante
RODRIGUEZ RODRIGUEZ, JOEL

Interesado  : MUNICIPO DE SAN JUAN,

Naturaleza  : Instancia                    Objeto : COMPRAVENTA

Escritura:

EXENTO DEL PAGO



# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

## CATEGORY SHEET

**You must accompany your complaint with this Category Sheet, and the Civil Cover Sheet (JS-44).**

Attorney Name (Last, First, MI):  Martorani-Dale, David O.

USDC-PR Bar Number:  226004

Email Address:  david.o.martorani@usdoj.gov

1.  Title (caption) of the Case (provide only the names of the first party on each side):

    Plaintiff:  United States of America

    Defendant:  Municipality of San Juan

2.  Indicate the category to which this case belongs:

    ☒ Ordinary Civil Case

    ☐ Social Security

    ☐ Banking

    ☐ Injunction

3.  Indicate the title and number of related cases (if any).

4.  Has a prior action between the same parties and based on the same claim ever been filed before this Court?

    ☐ Yes

    ☒ No

5.  Is this case required to be heard and determined by a district court of three judges pursuant to 28 U.S.C. § 2284?

    ☐ Yes

    ☒ No

6.  Does this case question the constitutionality of a state statute? (See, Fed.R.Civ. P. 24)

    ☐ Yes

    ☒ No

Date Submitted:  12/23/2020

rev. Dec. 2009

Print Form      Reset Form

JS 44   (Rev. 02/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| UNITED STATES OF AMERICA | MUNICIPALITY OF SAN JUAN |

| (b)  County of Residence of First Listed Plaintiff _____ <br> *(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant    San Juan, PR <br> *(IN U.S. PLAINTIFF CASES ONLY)* <br> NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF <br> THE TRACT OF LAND INVOLVED. |

| (c)  Attorneys *(Firm Name, Address, and Telephone Number)* <br> AUSA David O. Martorani-Dale <br> US Attorney's Office, 350 Chardon Ave, Suite 1201 <br> San Juan, PR 00918 Ph. 787-766-5656 | Attorneys *(If Known)* |

## II.  BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1   U.S. Government <br>     Plaintiff

☐ 3   Federal Question <br>     *(U.S. Government Not a Party)*

☐ 2   U.S. Government <br>     Defendant

☐ 4   Diversity <br>     *(Indicate Citizenship of Parties in Item III)*

## III.  CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place <br> of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place <br> of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a <br> Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance <br> ☐ 120 Marine <br> ☐ 130 Miller Act <br> ☐ 140 Negotiable Instrument <br> ☐ 150 Recovery of Overpayment <br>   & Enforcement of Judgment <br> ☐ 151 Medicare Act <br> ☐ 152 Recovery of Defaulted <br>   Student Loans <br>   (Excludes Veterans) <br> ☐ 153 Recovery of Overpayment <br>   of Veteran's Benefits <br> ☐ 160 Stockholders' Suits <br> ☐ 190 Other Contract <br> ☐ 195 Contract Product Liability <br> ☐ 196 Franchise | **PERSONAL INJURY** <br> ☐ 310 Airplane <br> ☐ 315 Airplane Product <br>   Liability <br> ☐ 320 Assault, Libel & <br>   Slander <br> ☐ 330 Federal Employers' <br>   Liability <br> ☐ 340 Marine <br> ☐ 345 Marine Product <br>   Liability <br> ☐ 350 Motor Vehicle <br> ☐ 355 Motor Vehicle <br>   Product Liability <br> ☐ 360 Other Personal <br>   Injury <br> ☐ 362 Personal Injury - <br>   Medical Malpractice | **PERSONAL INJURY** <br> ☐ 365 Personal Injury - <br>   Product Liability <br> ☐ 367 Health Care/ <br>   Pharmaceutical <br>   Personal Injury <br>   Product Liability <br> ☐ 368 Asbestos Personal <br>   Injury Product <br>   Liability <br> **PERSONAL PROPERTY** <br> ☐ 370 Other Fraud <br> ☐ 371 Truth in Lending <br> ☐ 380 Other Personal <br>   Property Damage <br> ☐ 385 Property Damage <br>   Product Liability | ☐ 625 Drug Related Seizure <br>   of Property 21 USC 881 <br> ☐ 690 Other | ☐ 422 Appeal 28 USC 158 <br> ☐ 423 Withdrawal <br>   28 USC 157 <br> **PROPERTY RIGHTS** <br> ☐ 820 Copyrights <br> ☐ 830 Patent <br> ☐ 835 Patent - Abbreviated <br>   New Drug Application <br> ☐ 840 Trademark <br> **SOCIAL SECURITY** <br> ☐ 861 HIA (1395ff) <br> ☐ 862 Black Lung (923) <br> ☐ 863 DIWC/DIWW (405(g)) <br> ☐ 864 SSID Title XVI <br> ☐ 865 RSI (405(g)) | ☐ 375 False Claims Act <br> ☐ 376 Qui Tam (31 USC <br>   3729(a)) <br> ☐ 400 State Reapportionment <br> ☐ 410 Antitrust <br> ☐ 430 Banks and Banking <br> ☐ 450 Commerce <br> ☐ 460 Deportation <br> ☐ 470 Racketeer Influenced and <br>   Corrupt Organizations <br> ☐ 480 Consumer Credit <br> ☐ 485 Telephone Consumer <br>   Protection Act <br> ☐ 490 Cable/Sat TV <br> ☐ 850 Securities/Commodities/ <br>   Exchange <br> ☐ 890 Other Statutory Actions <br> ☐ 891 Agricultural Acts |
| **REAL PROPERTY** <br> ☐ 210 Land Condemnation <br> ☐ 220 Foreclosure <br> ☐ 230 Rent Lease & Ejectment <br> ☐ 240 Torts to Land <br> ☐ 245 Tort Product Liability <br> ☒ 290 All Other Real Property | **CIVIL RIGHTS** <br> ☐ 440 Other Civil Rights <br> ☐ 441 Voting <br> ☐ 442 Employment <br> ☐ 443 Housing/ <br>   Accommodations <br> ☐ 445 Amer. w/Disabilities - <br>   Employment <br> ☐ 446 Amer. w/Disabilities - <br>   Other <br> ☐ 448 Education | **PRISONER PETITIONS** <br> **Habeas Corpus:** <br> ☐ 463 Alien Detainee <br> ☐ 510 Motions to Vacate <br>   Sentence <br> ☐ 530 General <br> ☐ 535 Death Penalty <br> **Other:** <br> ☐ 540 Mandamus & Other <br> ☐ 550 Civil Rights <br> ☐ 555 Prison Condition <br> ☐ 560 Civil Detainee - <br>   Conditions of <br>   Confinement | **LABOR** <br> ☐ 710 Fair Labor Standards <br>   Act <br> ☐ 720 Labor/Management <br>   Relations <br> ☐ 740 Railway Labor Act <br> ☐ 751 Family and Medical <br>   Leave Act <br> ☐ 790 Other Labor Litigation <br> ☐ 791 Employee Retirement <br>   Income Security Act <br> **IMMIGRATION** <br> ☐ 462 Naturalization Application <br> ☐ 465 Other Immigration <br>   Actions | **FEDERAL TAX SUITS** <br> ☐ 870 Taxes (U.S. Plaintiff <br>   or Defendant) <br> ☐ 871 IRS—Third Party <br>   26 USC 7609 | ☐ 893 Environmental Matters <br> ☐ 895 Freedom of Information <br>   Act <br> ☐ 896 Arbitration <br> ☐ 899 Administrative Procedure <br>   Act/Review or Appeal of <br>   Agency Decision <br> ☐ 950 Constitutionality of <br>   State Statutes |

## V.  ORIGIN *(Place an "X" in One Box Only)*

☒ 1   Original <br>   Proceeding

☐ 2   Removed from <br>   State Court

☐ 3   Remanded from <br>   Appellate Court

☐ 4   Reinstated or <br>   Reopened

☐ 5   Transferred from <br>   Another District <br>   *(specify)*

☐ 6   Multidistrict <br>   Litigation - <br>   Transfer

☐ 8   Multidistrict <br>   Litigation - <br>   Direct File

| VI.  CAUSE OF ACTION | Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*: <br> 28 U.S.C. § 2201 <br> Brief description of cause: <br> Request for Declaratory Judgment. GSA owned property - Defendant breached the quitclaim deed. |
|---|---|

| VII.  REQUESTED IN <br> COMPLAINT: | ☐  CHECK IF THIS IS A CLASS ACTION <br> UNDER RULE 23, F.R.Cv.P. | DEMAND $ | CHECK YES only if demanded in complaint: <br> JURY DEMAND:     ☐ Yes   ☒ No |
|---|---|---|---|

| VIII.  RELATED CASE(S) <br> IF ANY | *(See instructions):* | JUDGE _____ | DOCKET NUMBER _____ |
|---|---|---|---|

DATE   12/23/2020

SIGNATURE OF ATTORNEY OF RECORD   *David O. Martorani Dale*

**FOR OFFICE USE ONLY**

RECEIPT #_____    AMOUNT_____    APPLYING IFP_____    JUDGE_____    MAG. JUDGE_____